UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-80158-Cr-Hurley/Vitunac

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

FILIPE G. FERREIRA,

               Defendant.
_____/

FILED by _____ D.C.

FEB 2 5 2010

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## REPORT & RECOMMENDATION

THIS CAUSE is before the Court on general Order of Reference from United States District Judge Daniel T.K. Hurley for disposition of all pending pretrial criminal motions. Pending before the Court is Defendant's Motion to Suppress (DE 46), filed February 3, 2010. The Government filed a Response (DE 48) on February 10, 2010. Defendant did not file a reply. The Court held an evidentiary hearing on February 23, 2010. This matter is ripe for review.

## DEFENDANT'S MOTION TO SUPPRESS

Defendant's Motion seeks to suppress all evidence arising from the United States Coast Guard's stop and search of his vessel on November 30, 2009, including evidence obtained from the vessel and the people on the vessel, and statements by Defendant. Defendant argues that the stop and search were illegal under the Fourth Amendment because the Coast Guard "lacked probable cause to stop" his vessel. (Mot. 3). Defendant contends that the only reason his vessel was stopped "was on the pretext of a basic initial safety inspection." (Id.)

1

## GOVERNMENT'S RESPONSE

The Government argues that 14 U.S.C. § 89(a) permits the Coast Guard to conduct an administrative search of an American vessel as part of a safety or document check. Where, as here, such administrative search leads to the discovery of facts supporting a probable cause belief that further investigation is warranted or a violation of United States laws has occurred, further search is permissible. The Coast Guard boarded Defendant's American vessel for a routine safety check, during which time Defendant stated that only three people were on board. The Coast Guard asked Defendant to open the boat's cuddy cabin. Defendant opened the door and six other people were discovered in the cabin. At this point, the Government argues, the Coast Guard had reasonable suspicion to question the people, who turned out to be illegal aliens. Defendant had no privacy interest in the area where the illegal aliens were viewed. Accordingly, the Coast Guard did not violate Defendant's Fourth Amendment rights.

## FEBRUARY 23, 2010 EVIDENTIARY HEARING

Counsel for both parties appeared at the evidentiary hearing. One witness – Coast Guard Officer Wesley Samosuck – testified. In its opening remarks, the Government stated that on November 30, 2009, a Coast Guard cutter intercepted an American vessel traveling west toward the Florida coast. Defendant was the vessel's operator. Coast Guard officers boarded the vessel as part of a safety stop, during which time a search of the vessel's cuddy cabin revealed six illegal aliens. Defendant opened by acknowledging the Coast Guard's broad authority on the high seas. Defendant stated that he does not contest anything the Coast Guard learned after stopping the vessel, rather, Defendant contests only whether the Coast Guard had a reasonable basis for making the stop.

2

Officer Wesley Samosuck

Officer Samosuck has been a Coast Guard Boarding Officer for nine years. Officer Samosuck testified that, on November 30, 2009, he and other Coast Guard officers on board Coast Guard Cutter Blue Fin were patrolling Florida's east coast waters. Officer Samosuck was a crew member on watch. His colleague, Officer Strope, was the deck watch officer. At 1:15 p.m., Officer Samosuck observed a vessel on the radar. The vessel was headed westbound, directly toward the cutter. It was first observed approximately six miles away from the cutter. As the vessel approached within approximately one mile of the cutter, the cutter's blue lights were turned on and officers on board the cutter attempted to make radio contact with the vessel. The vessel did not respond or stop, which resulted in the cutter sending a yelp signal through its loud hailer. The vessel altered course to avoid the cutter. The cutter went after the vessel, and the vessel stopped soon thereafter.

Three males, including Defendant, were seen on board the vessel. According to Officer Samosuck, the males looked "very suspicious sitting there not talking to anybody." The males were all facing forward, and none looked in the cutter's direction. The cutter's officer in charge attempted to make pre-boarding inquiries, such as the vessel's last and next ports of call, the master's name and the master's date of birth, but it was hard to communicate with the three males because they did not speak English.

At approximately 2:00 p.m., Officer Samosuck and two other officers, Officers Strope and Blount, boarded the vessel for an administrative safety inspection. The boarding team introduced themselves as Coast Guard officers and advised the vessel's occupants that the team was boarding to conduct an administrative inspection of the vessel to ensure compliance with

3

all United States laws. Once on board, Officer Samosuck had Officer Blount conduct a basic safety inspection "to make sure it was safe for the boarding team" to be on the vessel. The basic safety inspection included checking the bilge for water, checking the hatches, and checking for other safety hazards. After checking the vessel's back hatches, Officer Blount went to check the forward hatches, which required him to go inside the cuddy cabin. The cabin was closed. Officer Blount asked Defendant to open the cabin. Defendant hesitated at first, but eventually opened the cabin where six additional persons were found. Officer Samosuck confirmed that the vessel was a United States vessel bearing Florida registration FL3569NA.

On cross-examination, Officer Samosuck stated that he was "on watch," meaning that he was monitoring the radar for vessels in the vicinity, when he first spotted the subject vessel. He could tell it was a vessel by looking at the radar. The cutter did not have to alter its course because the vessel was headed straight toward the cutter. Officer Samosuck testified that the cutter's officer in charge, Master Chief Mello, made the determination to conduct a safety inspection of the vessel. Officer Samosuck indicated that it is routine Coast Guard procedure to attempt contact with a subject vessel to determine its flag and status, and whether it has been previously boarded by the Coast Guard. This is part of the administrative safety inspection process.

On re-direct examination, Officer Samosuck confirmed the chronology of events. First, he observed the vessel on radar. Then, the cutter attempted to make radio contact with the vessel to try and determine its status. The vessel did not respond and, instead, fled. Using binoculars, the cutter determined that the vessel was registered in Florida. At that point, the cutter's officer in charge made the determination to board the vessel for safety purposes.

4

## DISCUSSION

The issue presented is whether the Coast Guard's stop of Defendant's vessel violated the Fourth Amendment, such that the evidence and statements derived from the stop and subsequent search should be suppressed. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Under the exclusionary rule, evidence derived from a search that violates the Fourth Amendment cannot be used in a criminal trial against the victim of the illegal search and seizure. United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003) (citations omitted).

When a law enforcement officer restrains an individual's "freedom to walk away," Terry v. Ohio, 392 U.S. 1, 16 (1968), a seizure occurs, invoking some level of Fourth Amendment p rotection depending upon the nature of the stop. An officer making an investigative stop must have reasonable suspicion based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the intrusion. Terry, 392 U.S. at 21, 30. In evaluating a stop, courts consider the totality of the circumstances and evaluate if the officer's actions were "reasonably related in scope to the circumstances which justified the interference in the first place," United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2000) (quoting Terry, 392 U.S. at 20), and if the duration of the stop was limited to the time necessary to effectuate its purpose. Id. (citing United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999)).

By statute, the Coast Guard is vested with plenary power to stop and board any American vessel anywhere on the high seas "to make safety and document inspections without

5

suspicion of criminal activity." United States v. Lopez, 761 F.2d 632, 636 (11th Cir. 1985); see

also United States v. Purvis, 768 F.2d 1237, 1238 (11th Cir.1985), cert. denied, 475 U.S. 1011

(1986). The pertinent Coast Guard boarding statute provides, in relevant part:

> The Coast Guard may make inquiries, examinations, inspections, searches,
> seizures, and arrests upon the high seas and waters over which the United States
> has jurisdiction, for the prevention, detection, and suppression of violations of
> laws of the United States. For such purposes, commissioned, warrant, and petty
> officers may at any time go on board of any vessel subject to the jurisdiction, or
> to the operation of any law, of the United States, address inquiries to those on
> board, examine the ship's documents and papers, and examine, inspect, and
> search the vessel and use all necessary force to compel compliance. When from
> such inquiries, examination, inspection, or search it appears that a breach of the
> laws of the United States rendering a person liable to arrest is being, or has been
> committed, by any person, such person shall be arrested...

14 U.S.C. § 89(a).

Once on board a boat, a limited search is permissible on a reasonable suspicion of

criminal activity. Lopez, 761 F.2d at 636 (citations omitted). In determining the existence of

reasonable suspicion, courts consider the totality of the circumstances and evaluate whether

there is reasonable suspicion based on specific and articulable facts which, taken together with

rational inferences drawn from those facts, reasonably warrant suspicion of criminal activity.

United States v. Roy, 869 F.2d 1427, 1430 (11th Cir. 1989) (citing United States v.

Brignoni-Ponce, 422 U.S. 873, 884 (1975)). A more expansive stem to stern boat search

requires the existence of probable cause that a crime has been, or is being, committed. Lopez,

761 F.2d at 636 (citations omitted). To determine the existence of probable cause, courts

examine whether the facts and circumstances known to law enforcement could have warranted

their reasonable belief that a crime had been or was being committed, or whether viewing such

facts in their totality, together with the synthesis of what the agents collectively heard, knew and

6

observed, all considered in light of the agent's individual experience, there was the probability that a crime had been or was being committed. Id. (citations omitted).

Here, Defendant seeks to suppress the evidence resulting from the Coast Guard's stop and subsequent search of his vessel. At the hearing, Defendant made clear that he is not challenging the Coast Guard search of his vessel. Defendant's sole argument is that the Coast Guard lacked a lawful basis for stopping his vessel in the first place. The Court disagrees. It is undisputed that Defendant's vessel is an American vessel. Officer Samosuck testified that he first observed the vessel on radar when it was approximately six miles away. He further testified that the Cutter Blue Fin never had to alter course because the vessel was traveling westbound directly toward the cutter. As the vessel approached, the Cutter Blue Fin attempted to contact the vessel's operators via blue lights, radio, and, as a last resort, loud hailer. The vessel did not respond. Instead, the vessel took evasive maneuvers to flee from the cutter. Officer Samosuck credibly testified that the Coast Guard's decision to stop and board the Defendant's vessel for an administrative safety inspection occurred only after attempts to communicate with the vessel's crew were unsuccessful, after the vessel fled, and after visually observing, with binoculars, that the vessel was registered in Florida. Under these circumstances, the Court finds that the Coast Guard lawfully stopped and boarded Defendant's vessel pursuant to its statutory authority under the Coast Guard boarding statute, 14 U.S.C. § 89(a), which broadly authorizes Coast Guard officers to stop and board any American flag vessel to make safety inspections without suspicion of criminal activity. See Lopez, 761 F.2d at 636.

In addition to its authority under the boarding statute, the Coast Guard also acted consistently with constitutional standards when it stopped Defendant's vessel. The evidence

7

establishes that the Coast Guard had reasonable suspicion to conduct an investigatory stop of Defendant's vessel. The vessel's crew did not respond when the Coast Guard officers attempted to hail the boat using blue lights, radio, and a loud hailer. In lieu of responding, the vessel fled. These facts gave the Coast Guard ample reason to question the safety or documentation of Defendant's vessel. After the vessel was stopped, the above facts, combined with the suspicious behavior of all three males on the vessel, provided the Coast Guard with probable cause to believe that a crime had been or was being committed. The Coast Guard acted on specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted the stop of Defendant's vessel. It is abundantly clear to the Court that the Coast Guard did not violate the Fourth Amendment when it stopped, boarded, and conducted a limited search of Defendant's vessel.

## RECOMMENDATION

The Court concludes that the Coast Guard acted consistently with both its statutory authority and the Fourth Amendment when it stopped and boarded the Defendant's vessel, and the evidence obtained as a result should not be suppressed. Accordingly, this Court respectfully recommends that Defendant's Motion to Suppress (DE 46) be DENIED.

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable United States District Judge Daniel T. K. Hurley, within fourteen (14) days after being served with a copy. See 28 U.S.C. § 636(b)(1)(C). Failure to file timely objections may limit the scope of appellate review of factual findings contained herein. See United States v. Warren, 687 F.2d 347, 348 (11th Cir. 1982), cert. denied, 460 U.S. 1087

(1983).

      DONE and SUBMITTED in Chambers at West Palm Beach in the Southern District of

Florida, this _____ day of February, 2010.

                ANN E. VITUNAC
                UNITED STATES MAGISTRATE JUDGE

Copies to:
U.S. District Judge Daniel T. K. Hurley
All counsel of record

9